**WM. CAMERON & CO., Inc., v. GIBSON et al. (No. 6872.)***

(Court of Civil Appeals of Texas. Austin. Nov. 3, 1925. Rehearing Denied Jan. 6, 1926.)

**1. Mechanics' liens ⊜⇒76—Landlords held to have ratified tenant's contract for construction of house and estopped to deny his authority.**

Farm owners, failing to notify corporation, which furnished materials and funds for erection of house under contract with tenant, that latter exceeded authority and that they repudiated his assumed agency, *held* to have ratified contract as matter of law, and estopped to deny his authority.

**2. Principal and agent ⊜⇒170(3)—Rule respecting silence as ratification of agent's unauthorized act stated.**

Principal's mere silence or delay in repudiating agent's unauthorized act may justify finding of ratification particularly where circumstances impose special duty to speak, but principal acquiescing in agent's act, on being informed thereof, will be held to have ratified it, particularly where delay in repudiating has been long, silence is accompanied by acts indicating approval or recognition of agent's act, or circumstances impose duty to act promptly.

**3. Principal and agent ⊜⇒170(3)—Principal bound to give notice of repudiation of acts of mere stranger, in whom he knows confidence is being reposed as supposed agent.**

Principal, knowing that confidence is being reposed in another as agent, and that further loss will be incurred by party dealing with latter unless his acts are repudiated, must give notice of repudiation, though supposed agent is mere stranger or interloper, especially where principal will receive further benefit from transaction if allowed to proceed.

**4. Principal and agent ⊜⇒174—Reasonable time for giving notice of agent's want of authority question of fact, unless but one reasonable conclusion can be drawn.**

Reasonable time for giving notice of agent's want of authority is question of fact, unless but one reasonable conclusion can be drawn from facts and circumstances.

**5. Mechanics' liens ⊜⇒76—Farm owners held bound to give notice of tenant's want of authority to contract for erection of house on morning after learning that it was being built.**

Farm owners *held* bound, as matter of law, to notify corporation, furnishing materials and funds for labor to erect house under contract with tenant, that latter was not authorized to make contract, and that they would not be bound thereby, while in town where corporation's place of business was located, on morning after learning that house was being constructed, and, having failed to do so, they could not question tenant's authority after completion of building, and were liable for additional loss to corporation.

**6. Principal and agent ⊜⇒145(4)—Corporation dealing with tenant as purported agent of one owner held entitled to sue latter alone or both owners on discovering that co-owner was also principal.**

Corporation, furnishing materials and funds for erection of house under contract with tenant as purported agent of managing owner, *held* entitled to view transaction as contract with such owner only and to sue him alone or both owners, after discovering that co-owner was also a principal.

Appeal from District Court, Bell County; Lewis H. Jones, Judge.

Action by Wm. Cameron & Co., Inc., against Guy M. Gibson and another. Judgment for defendants, and plaintiff appeals. Reversed and rendered.

G. H. Zimmerman, of Waco, and Jno. B. Daniel, of Temple, for appellant.

Sam D. Snodgrass, of Temple, and Karl F. Griffith, of Dallas, for appellees.

McCLENDON, C. J. Appellant, Wm. Cameron & Co., Inc., sued appellees, Guy M. Gibson and L. D. Cobb, for the sum of $2,798.80, the value of materials furnished and funds advanced for labor to erect a dwelling house upon a farm owned by appellees, and to foreclose a mechanic's and materialman's lien up-

---

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error refused February 24, 1926.

on 50 acres of land upon which the house was situated. The case was tried before a jury, but, upon conclusion of the evidence, each side requested a peremptory instruction. The court denied appellant's request, and granted that of appellees, and rendered judgment upon a directed verdict, denying appellant any recovery. The appeal is from this judgment.

[1] The house was constructed under a contract between appellant's agent at Belton and one J. O. Barnes, who was a tenant of appellees, and who represented that the land belonged to appellee Gibson, and that he (Barnes) was authorized to make the contract. Appellant had no knowledge that this representation was not true, or that appellee Cobb was a joint owner of the land, until after the house was constructed. The uncontradicted evidence shows that Gibson was in active management of the farm for himself and Cobb, and that the only authority he gave Barnes was to repair an old house at not exceeding $150 expense, and that Barnes exceeded his authority in making the contract for the erection of a new building and the expenditure of the amount which he incurred. The contract was made on October 8, 1923, and the building was not finally completed until January 19, 1924. Gibson and Cobb visited the premises on Sunday, November 25, 1923, and then for the first time learned that the house was being constructed and that Barnes had exceeded his authority. They went to Belton the same day, spent the night, and on the following morning had the house insured for $2,000, but did not notify appellant that Barnes had acted without their authority or in any way bring home to Cameron & Co. the fact that they repudiated the contract or had not authorized Barnes to bind them. At the time they visited the farm, the house was still in an uncompleted condition and there was some material on the premises that had not been used. Subsequently to that time appellant furnished under the contract $294 in material and $248 in money for labor which went into the building. The main question in the case is whether or not the failure of appellees to repudiate the assumed agency of Barnes amounted as a matter of law to a ratification on their part, or estopped them from denying his authority.

We have reached the conclusion that this question must be answered in the affirmative, and that the trial court's judgment must be reversed, and judgment rendered in favor of appellant for the amount sued for and foreclosure of the asserted lien. We will state as briefly as we may the substance of the evidence touching this question.

In September, 1923, Gibson made a verbal contract with Barnes to lease 284 acres of land which was owned by himself and Cobb, of which the 50 acres in question was a part. Barnes had a large family, and the farm was infested more or less with Johnson grass, and Gibson was anxious to have a good tenant to properly cultivate the farm and kill out the Johnson grass. There were two dwelling houses upon the place at the time, but neither of them was in good condition; and Barnes was directed by Gibson to make a trip to the farm, look over the improvements, and see what was necessary to be done to provide a habitable residence for himself and family. Barnes made an inspection of the premises and made several trips to Corsicana, where Gibson lived, on each of which occasions he had a conversation about improving the property. Without going into detail, the upshot of these conversations was that Gibson was unwilling to spend more than $150 in repairing the house, and authorized Barnes to have the repairs made for not exceeding that amount. Barnes, however, according to his testimony, concluded that the old residence or residences on the property were not worth the money necessary to repair them, and that it would be best for his landlord to build a new house, and thereupon took it upon himself to do so. He took the matter up with P. W. Clampitt, manager of appellant's lumber yard at Belton, and had a plan drawn for a one-story frame residence of five rooms, front gallery, and large sleeping porch at the rear. Clampitt's estimate of the cost of construction was about $1,700 or $1,800, and it was agreed that appellant would furnish the material at its yards at Belton, to be hauled to the premises by Barnes, and to furnish the money for the pay roll in connection with the construction. The total amount under the contract was to be paid when the house was completed and accepted. Clampitt understood from Barnes that Gibson was the sole owner of the property, and the items in the way of material and money were charged on appellant's books to Gibson's account. Later on Barnes decided to make use of space in the attic and changed the plans so as to provide a different internal wall construction, a stairway, and the finishing off of two attic rooms. The changes thus made increased the amount of the contract to the sum sued for. Under the agreement, the lumber and other materials were to be furnished at current prices. Appellees conceded on the trial that the items in the account were correct, and only appellees' liability was questioned. The old house was torn down, and part of the lumber in it was salvaged and used in the new building.

Appellee Cobb testified to visiting the premises in company with Gibson on November 25th, and for the first time learning that a new house was being constructed thereon. He questioned Barnes about his building the house, and Barnes was somewhat embarrassed. "We," Cobb testified, "couldn't get very much information out of him, but he said that he and they decided that we needed a new house, and they went ahead and built it." He interrogated him then about the financial arrangements, and who was going

to pay for it, and how much the house would cost, and Barnes told him about $1,800 or $2,000.

As stated above, he and Gibson went to Belton that evening and spent the night, and the next morning took out a policy of $2,000 insurance in their own names; his purpose was, "that I did not know where we were sitting legally, that there was a house on the place that belonged to somebody, and I thought we had better cover it with insurance." With reference to not notifying Cameron & Co., he testified:

"We had information from Mr. Barnes as to who had furnished the lumber, and we insured it before we found out where we were legally, and left town before finding out where we were at. I did not go to see Cameron about it, because I thought it was Cameron's move."

With reference to the condition of completion he found the house in, he testified:

"At the time we drove out there, we found a house there that was about complete. I don't know whether it had been painted or not now, I don't remember, but seems to me that it had not been entirely painted anyway. It is my recollection that the sleeping porch was complete except that it had not been screened. I don't know whether it had the flooring in it or not. The railing on the stairway leading up to the second story had not been put on, and some of the doors had not been varnished. There was some material on hand at the time. Mr. Gibson and I were out there for an hour or so, and we went into the building."

Gibson's version of the visit to the farm on November 25th is as follows:

"The first time that I knew he had built a new house, Mr. Cobb and I came down here, and I believe it was the 25th of November—I don't know just the exact date, but somewhere along there—and we drove up to the place and discovered a sure enough city residence on our farm. It was some house. I said to Mr. Cobb, 'Laws of mercy man, we must have one of these Aladdin's lanterns on our property, what does this mean?' and we jollied about it and laughed about it, and Cobb said that it was not on our place, but on a neighbor's, and I said, 'No; it is over on our property,' and we drove up and found that it was. And our friend Barnes came out and one or the other of us said, 'Barnes, what on earth does this mean?' and Barnes said, 'Well, it is all for the best.' I just laughed, and we kidded him and asked him who was financing this proposition; and he said, 'I have got a man up town, up to Belton;' and I asked him who it was, and he said Mr. Clampitt, and I said, 'Who financed it?' and he said, 'I am financing it;' and I said, 'You and Mr. Clampitt built us a house, who is going to pay for it?' and I said, 'Barnes, you haven't got anything to pay with;' and he said, 'I will have enough cotton money to pay this house out,' he said, 'We needed a good house and we built it.' Mr. Cobb and I got off to one side and laughed a little bit, and I said, 'What kind of attitude are we going to take, and what kind of a fix are we in?' and he said, 'I don't know;' and I said, 'Where are we at?' and he said, 'I don't know.' I said, 'We have got a house on the farm, and our tenant has got the lumber yard to build it, and this is the first time we have seen it and what are we to do?' and he said, 'I expect we better talk to those people;' and I says, 'Let's go talk to Barnes a little further;' and so we walked back up there, and I said, 'What is this house going to cost?' and he said, 'Clampitt's first estimate was $1,800,' and he thought by using his old house and the boys working and himself, that he was going to be able to hold the bill down to its original estimate, and that is what he told us, but said it might run to $2,000. Well, we looked at it. First we were kind of shy; we didn't know whether to go in and look at it or not, but we walked in and looked at it, and Barnes showed it to us, and we went up in the attic. It wasn't entirely complete; that is, the stairs going up to the attic rooms. I observed that the back porch was floored, and was complete all except the screens I think, and I said, 'Barnes, who is doing the labor?' and he said, 'Me and my boys and my wife are doing the papering and hanging the canvas and paper.' I asked him if he had a carpenter, and he said he did, and I asked him who was paying the carpenter's bill, and he said Cameron Company, and I said, 'How much do you lack being through?' and asked him if all the material was on the ground that was necessary to complete it, and he said it was, and I asked him who was going to finish it up, and he said that himself and boys and wife were going to finish it, and so we didn't see where we could do any good by going to Cameron, and we went back to Belton, and we knew this thing was going to be embarrassing to us, and it might get more embarrassing, because that is a very expensive luxury out there, and so we decided to take out an insurance policy, and, if anything happened, we would have that much to take care of the building with, and, if something didn't happen, it wouldn't cost us but a little to buy the insurance policy."

"I was out there on the 25th of November, and the reason I did not disclaim any interest in the house at that time was just like I told you, we didn't know where we were, we had an elephant on our hands, and didn't know what to do with it. It may be that, if I had gone to Cameron & Co. that day and told them that I had not given any authority to build a house on my land, and would not pay for it, they could have hauled away some of that material, but I don't know about that. I guess they could have saved the stuff that was on hand at that time, and they could have saved the amount they had put into the building for paint, or at least the part that was unpainted at that time. If I had gone in that day and repudiated the contract, they could have saved the $248 worth of labor they paid out after that, I suppose, but we didn't know that at that time. I testified awhile ago that the floor was in the sleeping porch at the time we inspected the house, and I might be mistaken about that, but I don't think I am. I did not notice a great deal to be done to the house at that time. Of course, they might have saved whatever material that was on the ground at the time we looked at the house if I had gone into Belton and repudiated the contract to them at that time, but Barnes said that all the material was on the ground. I

judge that Cameron & Co. could have gone out and got the material that was then on the ground, if I had repudiated the contract at that time. I judge that this $294 for material, and the $248 for labor, could have been saved by Cameron & Co., if I had gone right to their office at the time I looked at the house, and repudiated the contract, and it is also a fact that they could have saved the whole building if they had investigated a little before they started building. Of course, I suppose that whatever labor and material were spent out there after November 26th, could have been saved to Cameron & Co., if I had done that. I am not a lawyer, and I did not know where we were sitting in regard to the house out there, but we did decide before we left here that we would go by and insure the building, and we could find out what the status was later, and we did insure the building in our names for $2,000. I am a real estate man, and buy and sell real estate, and I know that it is the rule that insurance companies won't accept a risk at more than 75 or 80 per cent. of its value, but I know that rule is not followed altogether, because they usually carry all that I ask them to."

The uncontradicted evidence shows that neither Cobb nor Gibson ever in any way notified Cameron & Co. that Barnes did not have authority to bind them or that they repudiated his action in the matter until long after January 19, 1924, when the house was completed. The evidence further shows that Barnes acted for appellees in buying mules to the extent of about $1,100 and farming implements to the amount of $1,000, for use on the leased premises.

Cameron & Co. made the statutory affidavit required for fixing a lien under verbal contract made with the owner, and recorded the affidavit in Bell county on May 10, 1924. The original affidavit with clerk's certificate of its filing was attached as an exhibit to plaintiff's petition.

The legal principles which we think control the issue of appellees' liability are well established, and it will not be necessary to review in detail the numerous authorities upon the subject.

For the purposes of this case, we assume: That, although Barnes had authority from Gibson to bind appellees to the extent of making improvements upon the property not to exceed $150, he had no authority, either express or implied, to make the contract which he did make, that, up to the time appellees visited the premises on November 25, 1923, they had done nothing from which Cameron & Co. were warranted in assuming that Barnes had such authority, and were not bound at that time by anything Barnes had done, and that the building was attached to the soil, and became their property, and the fact that they permitted their tenant thereafter to live in it and insured it in their own name did not in any way affect their legal rights. We hold them liable solely upon their failure to notify Cameron & Co. that Barnes had exceeded his authority, and that they repudiated his assumption of authority to bind them.

[2] The general rule with reference to silence as ratification of an unauthorized agency is thus stated in 2 C. J. pp. 504, 505:

"Mere silence or delay on the part of a principal in repudiating the unauthorized act of an agent does not necessarily amount to a ratification, but, while it is not necessarily conclusive evidence of a ratification, unless it cannot be explained on any other theory, it is always an element to be considered in connection with other evidence tending to show a ratification, and may alone be sufficient to justify a finding of ratification, particularly where the circumstances impose a special duty upon the principal to speak, as where the other party is liable to be misled or injured by his failure to do so. As a general rule, however, if the principal, on being informed of the unauthorized act of the agent, does not then repudiate it or do so within a reasonable time thereafter, but without any objection acquiesces in what the agent has done, he will be held to have ratified the act, and this is particularly true where the delay has been for a long period, or where the principal's silence or failure to disavow is accompanied by acts on his part indicating an approval or recognition of the agent's acts, as where he receives and retains possession of, or exercises acts of dominion over, the subject-matter of the unauthorized act; or where the circumstances are such as to impose upon the principal a duty to act promptly, as where loss or injury to the other party is likely to result from a failure to do so."

Mechem on Agency states the rule thus (section 146):

"Whoever by his acts, his words, or his silence, has led an innocent third person reasonably to conclude that the act of another in his behalf has been adopted and sanctioned by him, and has permitted such third person to rely thereon in such a manner as to prejudice his rights if the conclusion is not correct, ought not to be heard to assert that the fact is otherwise than he has caused or permitted it to appear. Ratification, like authorization, of which it is the equivalent, is generally the creature of intent, but that intent may often be presumed by the law in cases where the principal, as matter of fact, either had no express intent at all, or had an express intent not to ratify. These acts, words, silences of the principal are sometimes spoken of as in themselves a ratification. As a rule, however, this is not strictly accurate. They are rather the evidence of a ratification than the ratification itself."

[3] A distinction is sometimes made between the acts of a mere stranger or interloper who purports to be the agent of the party sought to be bound and one who has been dealt with by the principal but has either exceeded his authority in a particular matter, or has assumed an authority which he did not have. Some authorities hold that, in the case of a mere stranger, no duty whatever rests upon the principal to give notice of the want of authority. But, even in cases of this character, where the principal knows that con-

fidence is being reposed in the agent and that, unless his acts are repudiated, further loss will be incurred by the party dealing with him, the positive duty rests upon the principal to give the notice; and this is especially true where the principal will receive further benefit from the transaction if it is allowed to proceed. See 2 C. J. 512; 31 Cyc. 1279; 1 Am. & Eng. Ency. of Law (2d Ed.) p. 1208, and cases cited.

[4] As to the time within which the principal must act in giving the notice, there is much divergence of view among the authorities. It is, however, quite generally held that the principal must act within a reasonable time, and ordinarily what is a reasonable time under the facts and circumstances of a particular case is a question of fact. But, when the facts and circumstances are such that but one reasonable conclusion can be drawn therefrom, the question becomes one of law for the court.

[5] The undisputed evidence in the present case shows that Barnes had authority from appellees to have the old house repaired at a cost of not exceeding $150. He assumed to bind Gibson as the sole owner of the premises, under the representation that he had authority to do so. The house in a still uncompleted condition was visited by appellees on November 25, 1923, and then for the first time they discovered that Cameron & Co. were furnishing the materials and money for labor to erect the house; that there was still some material on the ground, and there was still labor to be done and material to be furnished to complete the edifice. They knew that Barnes had violated their instructions, and that he was conscious of such violation; they spent the night in Belton, and on the following morning went to the bank, which was situated about a block and a half from appellant's place of business, and took out a policy of insurance to protect whatever interest they had in the building. They may have been misled by Barnes as to what it would take to complete the building, but they knew that Barnes had already misled them; they knew that appellant had trusted and was trusting Barnes, and they determined to leave matters where they were and take whatever consequences that might attach to their inaction. They did nothing from that time until long after the building was completed to inform Cameron & Co. that they did not recognize Barnes' authority, and only gave them this notice after several telephone conversations between Clampitt and Gibson, in which the former, beginning shortly after January 19th, repeatedly demanded a settlement. Gibson at each conversation promised to come to Belton and adjust the matter when he was able. Gibson testified that he was sick during a large part of this time, but there is no evidence of any reason whatever for failure to repudiate Barnes' authority from November 25, 1923, to January 19, 1924, when the building was completed, during which time Cameron & Co. put out in labor and materials over $500 additional.

Tested by the rules of common honesty between men in their dealings with each other, we think as a matter of law the duty rested upon appellees of promptly repudiating Barnes' authority as soon as they could reasonably do so after gaining the information they acquired on November 25, 1923. They had every opportunity on the following morning to notify appellant's manager; they were in the town where appellant's place of business was located, and with little or no inconvenience could have gone there and given the notice. They were very solicitous about protecting themselves from the contingency of a fire loss, but were utterly oblivious to any rights appellant might have. They sought no information from appellant but, on the other hand, studiously avoided its place of business. They knew that there was then upon the premises unused material which had been furnished by Cameron & Co., and that it would be placed in the building on their premises and might become their property. While they may not have known that additional materials or money would be furnished by appellant they had readily at hand the means of ascertaining all the facts and circumstances in connection with the building, and willfully neglected or refused to avail themselves of that information. Under all the circumstances in the case, and viewing the testimony most favorably from the standpoint of appellees themselves, we think but one reasonable conclusion can be drawn, and that is that it was the duty of appellees promptly to notify Cameron & Co. of Barnes' want of authority and of their refusal to be bound by his acts. Having failed in this duty, they should not be permitted to question Barnes' authority after the building was completed, and the additional loss to Cameron & Co. was incurred to their benefit.

[6] Appellees insist that, because Barnes did not purport to act for Cobb but only for Gibson, the former is not bound, and suit cannot be maintained, since it is against both and not against Gibson alone. We overrule this contention. The undisputed evidence shows that the farm was owned jointly by Cobb and Gibson, that Gibson was attending to its management under full authority from Cobb, and that Cobb was in fact an undisclosed principal along with Gibson. Appellant had the right to view the transaction entered into by it as a contract by Gibson alone as principal, but, upon discovering that Cobb was also a principal in the matter, although undisclosed, it had the option of suing Gibson alone or suing both. This principle is now well established in this state. Heffron v. Pollard, 73 Tex. 100, 11 S. W. 165, 15 Am. St. Rep. 764; Ranch Co. v. Bell (Tex. Civ. App.) 275 S. W. 81.

The trial court's judgment is reversed, and

judgment is here rendered in favor of appellant for the amount sued for and foreclosure of the asserted lien.

Reversed and rendered.